[L.A. No. 31016. Apr. 12, 1979.]

CLEMENS A. HACKETHAL, Plaintiff and Appellant, v.
ARTHUR S. WEISSBEIN, Defendant and Respondent.

CLEMENS A. HACKETHAL, Plaintiff and Appellant, v.
IRVING L. SPRATT, Defendant and Respondent.

CLEMENS A. HACKETHAL, Plaintiff and Appellant, v.
J. LAMONT MURDOCH, Defendant and Respondent.

**COUNSEL**

Edward J. Horowitz and Arthur J. Jaffee for Plaintiff and Appellant.

Wilson, Borror & Dunn, Lucien A. Van Hulle, Moore, Graves & Madory and Richard E. Madory for Defendants and Respondents.

Hassard, Bonnington, Rogers & Huber, Howard Hassard, David E. Willett, Charles F. Bond II, Musick, Peeler & Garrett, James E. Ludlam and Charles F. Forbes as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

NEWMAN, J.—Plaintiff has appealed from judgments of dismissal in three consolidated actions after the trial court sustained demurrers, without leave to amend, on the ground that allegedly defamatory publications were immunized by these words of Civil Code section 47: "A privileged publication . . . is one made . . . [i]n any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding authorized by law . . . ."[1] The parties agree that the privilege—if those words create it—would be absolute, not qualified.

---

[1] The section in its entirety reads: "A privileged publication or broadcast is one made—
"1. In the proper discharge of an official duty.
"2. In any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding authorized by law; provided, that an allegation or averment contained in any pleading or affidavit filed in an action for divorce or an action prosecuted under Section

■ The issue here is whether a hearing before the judicial commission of a private medical society is an "official proceeding authorized by law" within the scope of Civil Code section 47.

Plaintiff is a doctor and a specialist in internal medicine. In 1975 he was accused by the public service committee of the San Bernardino County Medical Society (SBCMS) of violating certain principles of ethics of the American Medical Association. Hearings were held before the SBCMS judicial commission, and he was expelled from SBCMS membership. Defendants appeared at the hearing as witnesses and presented derogatory information as to his methods of medical practice.

The first cause of action in each of the three complaints seeks damages on the ground that defendants' testimony was negligently given, in that they did not make reasonable efforts to ascertain the truth and did not reasonably believe that the testimony was warranted by facts known to them. The second cause of action alleges that the testimony was motivated by malice.

### *Was the medical society hearing "official"?*

It is argued here that the SBCMS hearing did constitute an "official proceeding authorized by law" because the members of even a private association may not be expelled without charges, notice, and hearing. (See *Pinsker* v. *The Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541 [81 Cal.Rptr. 623, 460 P.2d 495].)

---

137 of this code made of or concerning a person by or against whom no affirmative relief is prayed in such action shall not be a privileged publication or broadcast as to the person making said allegation or averment within the meaning of this section unless such pleading be verified or affidavit sworn to, and be made without malice, by one having reasonable and probable cause for believing the truth of such allegation or averment and unless such allegation or averment be material and relevant to the issues in such action.

"3. In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information.

"4. By a fair and true report in a public journal, of (1) a judicial, (2) legislative, or (3) other public official proceeding, or (4) of anything said in the course thereof, or (5) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant shall have been issued.

"5. By a fair and true report of (1) the proceedings of a public meeting, if such meeting was lawfully convened for a lawful purpose and open to the public, or (2) the publication of the matter complained of was for the public benefit."

*Ascherman* v. *Natanson* (1972) 23 Cal.App.3d 861 [100 Cal.Rptr. 656] held that a hearing by the directors of a public hospital district on a doctor's application for staff privileges was an official proceeding authorized by law. The court inquired as to "(1) whether the administrative body is vested with discretion based upon investigation and consideration of evidentiary facts, (2) whether it is entitled to hold hearings and decide the issue by the application of rules of law to the ascertained facts and, more importantly (3) whether its power affects the personal or property rights of private persons . . . ." (23 Cal.App.3d at p. 866.)

In *Ascherman* as in nearly all the pertinent cases the body conducting the hearing was a government agency. (See *Imig* v. *Ferrar* (1977) 70 Cal.App.3d 48 [138 Cal.Rptr. 540] (police department); *Frisk* v. *Merrihew* (1974) 42 Cal.App.3d 319 [116 Cal.Rptr. 781, 85 A.L.R.3d 1128] (school board); *King* v. *Borges* (1972) 28 Cal.App.3d 27 [104 Cal.Rptr. 414] (real estate commissioner); *Wyatt* v. *Tahoe Forest Hospital District* (1959) 174 Cal.App.2d 709 [345 P.2d 93] (public district).)

*Goodley* v. *Sullivant* (1973) 32 Cal.App.3d 619 [108 Cal.Rptr. 451] seems to be the only case that equates private with public. The hearings there were before committees of a private hospital to consider suspension of a doctor's privileges. The court ruled that *Ascherman* should apply to private hospitals because Business and Professions Code section 2392.5 requires every hospital having five or more doctors to promulgate rules for the operation of the hospital, including rules to help assure the competency of the medical staff. ■ The mere fact that a statute requires the creating of committees or other groups does not, however, mean that each body so formed is "official." The committees of a private hospital are not government agencies. (Cf. Tobriner & Grodin, *The Individual and the Public Service Enterprise in the New Industrial State* (1967) 55 Cal.L.Rev. 1247, 1255, fn. 35.) The requirement in subdivision (c) of section 2392.5 that the medical staff be "self-governing" also indicates that the Legislature had no intent to create "official" bodies.

*Katz* v. *Rosen* (1975) 48 Cal.App.3d 1032 [121 Cal.Rptr. 853] ruled that the hearing by a local bar association to consider the expulsion of one of its members is not official. *McMann* v. *Wadler* (1961) 189 Cal.App.2d 124 [11 Cal.Rptr. 37] similarly ruled that a proceeding by the directors of a dairymen's association is not official. The court stated that an " 'official proceeding' . . . [is one] which resembles judicial and legislative proceedings, such as transactions of administrative boards and quasi-judicial and

quasi-legislative proceedings, not a meeting of a board of directors of a nonprofit corporation or the like. (See Prosser on Torts [2d ed.], § 95; *Gunsul* v. *Ray*, 6 Cal.App.2d 528, 530 . . . .)" (189 Cal.App.2d at p. 129.)

*Legislative history*

■ The Civil Code's original section 47 used the adjective "official" only in subdivision 1 ("official duty") and subdivision 4 ("official proceeding"). Section 47, subdivision 2 read, "In testifying as a witness in any proceeding authorized by law . . . ."

In the history of the 1873-1874 amendment that affects our analysis here we find no explanation of the amendment. What the amenders did was to revise section 47, subdivision 2 to read, "in any legislative or judicial proceeding, or in any other *official* proceeding authorized by law . . . ." (Italics added.) The intent of adding the word "official" may well have been to deny the absolute privilege in nongovernment proceedings.[2] ■ ■ . We could hardly construe the words "official duty" in section 47, subdivision 1, unchanged since 1872, to include nongovernment duties. The words of section 47, subdivision 2—"in any . . . official proceeding"—similarly merit no extension.[3]

■ *Does Civil Code § 43.8 imply that § 47(2)'s absolute privilege extends to the hearings described in § 43.8?*

Section 43.8, enacted in 1974 (and amended in 1975, 1976, and 1977), extends a qualified privilege to communications that are "intended to aid in the evaluation of the qualifications, . . ." of a doctor if there is not represented as true any matter not reasonably believed to be true and if the communications are addressed "to any hospital, hospital medical staff, professional society, medical or dental school, professional licensing board or division, committee or panel of such licensing board, peer review committee, or underwriting committee . . . ."[4] (See also § 43.7,

---

[2]Because the Code Commissioners in 1872 had cited page 317 of 1 Hilliard on Torts (1866), which leads into a discussion of nongovernment proceedings (on pp. 328-329), the 1873-1874 revisers might well have believed that section 47, subdivision 2, if left unamended, would apply to such proceedings.

[3]In general there is no legal requirement that members of private bodies take any oath of office. Nor is it required that witnesses before them take a testimonial oath—which means, of course, that the threat of a perjury charge is generally no deterrent.

[4]Civil Code section 43.8 reads: "In addition to the privilege afforded by Section 47, there shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any person on account of the communication of information in the

regarding action "without malice.") The protection of section 43.8 is "[i]n addition to the privilege afforded by Section 47," and "[t]he immunities afforded . . . shall not affect the availability of any absolute privilege which may be afforded by Section 47."

Since the Legislature in 1974 apparently intended to create additional immunity, the draftsmen must have concluded that at least some proceedings covered by section 43.8 until then had not been protected by section 47, subdivision 2. The intent seems to have been (1) to provide immunity to bodies not previously protected, and (2) to provide only a qualified immunity for communications made to a variety of medical groups.

The hearing in our case was a section 43.8 hearing, not a section 47, subdivision 2, "official proceeding." The enactment of section 43.8 makes sense because section 47, subdivision 2 applies exclusively to government agencies. The new section extends a qualified privilege to communications made to private groups; it does not imply that those groups benefit too from section 47, subdivision 2's absolute privilege.

The trial court should not have sustained the demurrers. The judgments are reversed.[5]

Bird, C. J., Mosk, J., and Manuel, J., concurred.

**TOBRINER, J.**—I dissent. The sole issue presented by this case is whether a doctor who was the subject of a local medical association "peer review" disciplinary proceeding may maintain a defamation action against a witness who testified against him at the association's quasi-judicial hearing. It has long been settled both in this state and throughout the country that the testimony of a witness at a judicial proceeding is absolutely privileged and may not be the basis of a defamation action, and just three years ago, in *Westlake Community Hosp.* v. *Superior Court*

possession of such person to any hospital, hospital medical staff, professional society, medical or dental school, professional licensing board or division, committee or panel of such licensing board, peer review committee, or underwriting committee described in Section 43.7 when such communication is intended to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner of the healing arts and does not represent as true any matter not reasonably believed to be true. The immunities afforded by this section and by Section 43.7 shall not affect the availability of any absolute privilege which may be afforded by Section 47."

[5]*Goodley* v. *Sullivant, supra,* 32 Cal.App.3d 619, cited approvingly in *Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465, 482 [131 Cal.Rptr. 90, 551 P.2d 410], is disapproved to the extent it is inconsistent with views expressed herein.

(1976) 17 Cal.3d 465 [131 Cal.Rptr. 90, 551 P.2d 410], this court, in an unanimous decision, expressly concluded that this absolute privilege applies to statements made in the course of quasi-judicial proceedings conducted by a medical "peer review" authority without regard to whether the medical body was nominally a governmental or nongovernmental entity.

In arriving at a contrary conclusion in the present case, the majority opinion gives extremely short shrift to our recent, unanimous decision in *Westlake,* mentioning the case only in passing in a brief footnote at the conclusion of the opinion. (*Ante,* p. 61, fn. 5.) It does so without discussion of the facts of that case or of our court's analysis of the legal question at issue. As I shall explain, I believe that the *Westlake* decision is controlling in this matter and directly supports the trial court's action in dismissing the plaintiff's defamation action.

Moreover, contrary to the majority's suggestion, I shall point out that the interpretation of section 47 subdivision 2 adopted in *Westlake* is not only consistent with the language, purpose and past judicial interpretations of the section but, in addition, is directly confirmed by the most recent legislative action in this area. Finally, I shall explain that the distinction which the majority would draw between quasi-judicial proceedings of governmental and nongovernmental medical entities is both illogical and directly contrary to the parallel treatment that such quasi-judicial proceedings have been accorded in past judicial decisions. For all these reasons, I conclude that the judgment of the trial court should be affirmed.

I begin with this court's recent decision in *Westlake.* In *Westlake,* as in the instant case, a doctor who had been disciplined after a quasi-judicial peer review proceeding *of a nongovernmental medical entity* (in that case, a privately owned hospital) instituted a civil action for damages arising out of the proceeding. In *Westlake,* unlike the instant case, however, the action was brought against the medical decision-makers in the quasi-judicial proceeding, rather than against a witness. The defendants in *Westlake* contended that they were entitled to summary judgment on a number of grounds, arguing, inter alia, that plaintiff's action was barred by the absolute privilege of section 47, subdivision 2, the provision at issue here.

In response to defendants' argument, we stated: "Section 47, subdivision 2, affords an absolute privilege (see, e.g., *Albertson* v. *Raboff* (1956)

46 Cal.2d 375, 379 [295 P.2d 405]) to any 'publication or broadcast' made in connection with any legislative, judicial, or 'other official proceeding authorized by law,' and several Court of Appeal decisions have construed this provision to protect statements made in connection with quasi-judicial proceedings conducted by hospital boards. (See *Goodley* v. *Sullivant* (1973) 32 Cal.App.3d 619 [108 Cal.Rptr. 451]; *Ascherman* v. *Natanson* (1972) 23 Cal.App.3d 861 [100 Cal.Rptr. 656].) *To the extent that plaintiff's present action rests upon an injury resulting from specific statements or testimony given by individual defendants during the Westlake proceedings, the action would be precluded under these authorities.*" (Italics added; fn. omitted.) (17 Cal.3d at pp. 481-482.)

We went on in *Westlake* to find that "the gist of [plaintiff's] claim is not that her injury has been occasioned simply by defendants' malicious *statements* at the proceedings, but rather that she has been injured by the malicious *actions* of the hospital and its committee members in revoking her staff privileges" (original italics) (*id.,* at p. 482), and accordingly we concluded that the provisions of Civil Code section 43.7, rather than section 47 subdivision 2, were applicable. The above passage makes it clear, however, that our decision in *Westlake* expressly determined that "[t]o the extent that plaintiff's present action rests upon an injury resulting from specific . . . testimony given by individual defendants during the [nongovernmental, quasi-judicial] proceedings, *the action would be precluded . . . .*" Since in the instant case plaintiff's action unquestionably rests entirely on defendant's testimonial statements at the quasi-judicial proceeding, and not on any additional actions taken by the defendant, *Westlake* upholds the trial court's ruling that section 47, subdivision 2 precludes plaintiff's action.

The majority, virtually ignoring our directly relevant decision in *Westlake,* base their conclusion that the absolute privilege of section 47, subdivision 2 is inapplicable in this case solely on the fact that the San Bernardino County Medical Society, which conducted the quasi-judicial proceeding, is not formally a "governmental" entity. That fact, of course, in no way distinguishes this case from *Westlake* or from the similarly relevant Court of Appeal decision in *Goodley* v. *Sullivant, supra.* The majority, however, apparently now take the view that the language of section 47, subdivision 2 precludes the provision's application to any nongovernmental proceeding, no matter how similar in nature the proceeding is to a judicial proceeding and without regard to whether the policies underlying section 47, subdivision 2 apply to such a nongovernmental proceeding. As I explain, neither the language, the purpose nor

the long line of decisions interpreting section 47, subdivision 2 supports the majority's restrictive reading of the section. Moreover, as I point out, recent legislative action reveals quite clearly that the Legislature does not concur in the majority's novel interpretation of the section.

As already noted, section 47, subdivision 2 provides in relevant part: "A privileged publication or broadcast is one made . . . 2. In any (1) legislative or (2) judicial proceeding, or (3) in any other *official proceeding authorized by law* . . . ." (Italics added.) Although the majority suggest that the "official proceeding authorized by law" language necessarily confines the statute's operation to proceedings conducted by governmental bodies, there is nothing in the statutory language which equates "*official* proceedings authorized by law" with "*governmental* proceedings authorized by law." As the majority concede, the quasi-judicial proceedings conducted by the local medical association in this case were not only "authorized by law," but, indeed, *were required under California law.* (See *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541 [81 Cal.Rptr. 623, 460 P.2d 495].) Moreover, the proceedings in question were certainly "official," as opposed to "unofficial" or "informal," since they were duly authorized by the association's bylaws and were conducted as quasi-judicial proceedings in conformity with this court's applicable decisions. (*Id.*)

The majority imply, however, that the term "official" in section 47, *subdivision 2,* must be interpreted as synonymous with "governmental" in light of the provisions of section 47, *subdivision 1,* which provide that "[a] privileged publication or broadcast is one made—1. In the proper discharge of an *official* duty." (Italics added.) The majority apparently intend to suggest that subdivision 1 applies whenever a statement is made by one discharging a "governmental" duty, and that subdivision 2 should similarly be construed to apply to statements made during "governmental" proceedings.

The fundamental flaw in this analysis is that, contrary to the majority's suggestion, the term "official" in section 47, subdivision 1 has not been interpreted as synonymous with "governmental." Although by its express terms section 47, subdivision 1 does not draw distinctions between statements made by different public officials, "[t]he California cases interpreting this provision leave no doubt that the absolute privilege under subdivision 1 is extended only to high ranking federal and state officials such as the President of the United States, governors of the states and territories, the members of the President's cabinet, heads of federal

agencies, and comparable state officers . . . ." (*Frisk* v. *Merrihew* (1974) 42 Cal.App.3d 319, 323 [116 Cal.Rptr. 781, 85 A.L.R.3d 1128]; see, e.g., *Saroyan* v. *Burkett* (1962) 57 Cal.2d 706, 708-711 [21 Cal.Rptr. 557, 371 P.2d 293].) Thus, if the word "official" in the two subdivisions were necessarily to be interpreted identically, as the majority imply, the "official proceedings" to which subdivision 2 would apply would be limited to proceedings conducted by the above enumerated high-ranking public officials. A host of cases, of course, unquestionably establish that any such interpretation of section 47, subdivision 2 is clearly untenable. (See, e.g., *Imig* v. *Ferrar* (1977) 70 Cal.App.3d 48, 55-57 [138 Cal.Rptr. 540] (police department proceeding); *Frisk* v. *Merrihew, supra,* 42 Cal.App.3d 319 (school board proceeding); *King* v. *Borges* (1972) 28 Cal.App.3d 27 [104 Cal.Rptr. 414] (real estate commission proceeding).)

Although section 47, subdivision 1 thus does not bear the relevance to this matter that the majority suggest, the cases interpreting section 47, subdivision 1 are instructive in this context for they teach that a proper interpretation of the various subdivisions of section 47 cannot be gleaned from a sterile review of the statutory language, but rather must take account of the purposes and public policies underlying each of the distinct statutory provisions. (See *Saroyan* v. *Burkett, supra,* 57 Cal.2d 706, 709-710.) Indeed, in *Saroyan* our court emphasized that in interpreting the various privileges embodied in Civil Code section 47 it is "particularly appropriate" to consider the general evolution of common law principles in the area "because [the section] was evidently intended as a codification of the general principles developed by the courts." (*Id.,* at p. 710. Cf. *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804, 821-823 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393].)

The important public policy served by according witnesses an absolute privilege against defamation actions is not difficult to ascertain. As one tribunal explained more than a century ago, the absolute testimonial privilege "was established, not for the benefit of witnesses, but for that of the public and the advancement of the administration of justice, to prevent witnesses from being deterred by the fear of having actions brought against them from coming forward and testifying to the truth." (*Seamon* v. *Netherclift* (1876) 2 C.P.D. 53, 62. See generally Rest.2d Torts, § 588, com. (a); 1 Harper & James, Law of Torts (1956) § 5.22, p. 424.)

Recognizing that society's interest in encouraging witnesses to give testimony, particularly in matters concerning the public health and safety, and in protecting witnesses when they perform this civic responsibility, is

not confined to strictly "judicial" proceedings but often applies to similar "quasi-judicial" proceedings as well, judicial authorities have long held the absolute testimonial privilege applicable in such quasi-judicial contexts. As long ago as 1860, for example, the New York Court of Appeals in construing a similar statute observed that "the transactions embraced in the purview of the statute *are such as resemble judicial . . . proceedings,* such as the transactions of administrative boards in which the subjects dealt with are liable to be considered, deliberated upon, discussed and determined." (Italics added.) (*Stanford* v. *Bennett* (1860) 24 N.Y. 20, 26.) Professor Prosser, reviewing contemporary cases on the subject, has noted that the proceedings to which the absolute immunity applies "includes any hearing before a tribunal which performs a judicial function. . . . It extends . . . to the proceedings of many administrative officers, such as boards and commissions, so far as they have powers of discretion in applying the law to the facts which are regarded as judicial, or *'quasi-judicial,'* in character. Thus, the ordinary administrative proceeding to revoke a license is held to be within the privilege." (Italics added.) (Prosser, Law of Torts (4th ed. 1971) pp. 779-780.)

In applying section 47, subdivision 2, past California cases have been sensitive to the underlying purposes of the section. Rather than drawing a rigid distinction between governmental and nongovernmental proceedings, as the majority propose, past cases have focused on the nature of the proceedings, and have uniformly held that when proceedings are quasi-judicial in nature, the absolute privilege of subdivision 2 *is* applicable. (See, .e.g., *Westlake, supra*; *Imig* v. *Ferrar, supra,* 70 Cal.App.3d 48, 55 and cases cited.)[1]

[1]Neither *Katz* v. *Rosen* (1975) 48 Cal.App.3d 1032 [121 Cal.Rptr. 853], nor *McMann* v. *Wadler* (1961) 189 Cal.App.2d 124 [11 Cal.Rptr. 37], two cases relied upon by the majority, is to the contrary. In *Katz,* unlike the instant case, the statement in question was not made in the course of any "proceeding" of the local bar association, and the Court of Appeal found section 47, subdivision 2's privilege inapplicable simply because the court concluded that the local bar association did not have the authority to conduct such quasi-judicial proceedings on the matter. Contrary to the majority's suggestion, nothing in the *Katz* opinion indicates that the absolute privilege of subdivision 2 applies only to governmental proceedings, and *Katz* specifically recognizes that if an association were authorized to conduct quasi-judicial proceedings on disciplinary matters, the absolute privilege of subdivision 2 would apply. (48 Cal.App.3d at p. 1036.)

In *McMann,* the allegedly defamatory statement in question was made during a meeting of a private association (a dairyman's association) in which a member of the association was expelled. The meeting in question in *McMann,* however, occurred in 1957, more than a decade and a half prior to this court's decision in *Pinsker, supra,* and, as a consequence, the meeting did not resemble a quasi-judicial proceeding in any form. The *McMann* court relied on the informal nature of the meeting in concluding that the absolute privilege of section 47 subdivision 2 was not applicable, stating: "[I]t was not the legislative intent to grant an absolute privilege for every defamatory utterance made in

There can be no doubt that, under the California cases, the medical society proceeding in question in this case was "quasi-judicial" in nature. From all indications, the hearing procedure conducted by the local medical society's "judicial council" was in all relevant respects identical to the peer review proceedings that were held to be "quasi-judicial" for purposes of section 47, subdivision 2 in *Ascherman* v. *Natanson, supra,* 23 Cal.App.3d 861 (public hospital proceeding), *Goodley* v. *Sullivant, supra,* (private hospital proceeding) and, of course, *Westlake* (private hospital proceeding). (See also *Anton* v. *San Antonio Comm. Hosp.* (1977) 19 Cal.3d 802 [140 Cal.Rptr. 442, 567 P.2d 1162] (private hospital); *Wyatt* v. *Tahoe Forest Hospital Dist.* (1959) 174 Cal.App.2d 709, 716 [345 P.2d 93] (public hospital).)

Implicit in all of these prior decisions is the recognition that the public policy of encouraging witnesses to testify, and protecting witnesses when they do so testify, applies with as much force to such medical peer review proceedings as to other "official" administrative proceedings covered by section 47, subdivision 2. As a New Mexico court recently stated in a case arising out of a similar local medical society proceeding: "The policy reasons for according the same privilege to quasi-judicial proceedings involving peer review of alleged professional misconduct are at least equally compelling [as in the case of other proceedings covered by the absolute privilege.] The appropriate professional societies, by exercising peer review, can and do perform a great public service by exercising control over those persons placed in a position of public trust . . . ." (*Franklin* v. *Blank* (Ct.App. 1974) 86 N.M. 585 [525 P.2d 945, 946].) For similar reasons, in recent years an increasing number of our sister jurisdictions have held that statements made during comparable local bar association quasi-judicial proceedings are cloaked with an absolute privilege. (See *Ramstead* v. *Morgan* (1959) 219 Ore. 383 [347 P.2d 594, 77 A.L.R.2d 481]; *Wiener* v. *Weintraub* (1968) 22 N.Y.2d 330 [292 N.Y.S.2d 667, 239 N.E.2d 540]; *McAfee* v. *Feller* (Tex.Civ.App. 1970) 452 S.W.2d 56.)[2] Thus,

every lawful meeting. We are persuaded that the 'official proceeding' embraced in the purview of the statute is that which resembles judicial and legislative proceedings, such as transactions of administrative boards and quasi-judicial and quasi-legislative proceedings . . . ." (189 Cal.App.2d at pp. 128-129.)

[2]In addition, numerous courts have recently held the absolute testimonial privilege applicable to statements of witnesses made during contractually authorized arbitration proceedings. (See *Neece* v. *Kantu* (Ct.App. 1973) 84 N.M. 700 [507 P.2d 447, 60 A.L.R.3d 1030]; *General Motors Corporation* v. *Mendicki* (10th Cir. 1966) 367 F.2d 66; *Corbin* v. *Washington Fire and Marine Insurance Company* (D.S.C. 1968) 278 F.Supp. 393, affd. (4th Cir.) 398 F.2d 543. See also Rest.2d Torts, §§ 588 com. (d), 585, com. (c).) Although such arbitration proceedings are intended as an alternative to judicial proceedings, and are being resorted to with increasing frequency, under the majority's interpretation of section

both prior judicial authorities and the purpose of section 47, subdivision 2 support the trial court's application of the provision in this case.

Furthermore, recent legislation makes it clear that the Legislature has endorsed the interpretation of section 47, subdivision 2 which the majority now repudiate. As noted above, in 1972, the Court of Appeal in *Ascherman* v. *Natanson, supra,* specifically held that the absolute privilege of section 47, subdivision 2 applies to statements made during a quasi-judicial peer review proceeding conducted by a medical committee of a public hospital district. The following year, in 1973, a different Court of Appeal panel held in *Goodley* v. *Sullivant, supra,* that the absolute privilege of section 47, subdivision 2 was similarly applicable to statements made during analogous quasi-judicial proceedings conducted by a medical committee of a nongovernmental, privately owned hospital.

Following the *Ascherman* and *Goodley* decisions, the Legislature in 1974 set about to provide *additional* protections to persons communicating with medical peer review committees who did not come within the scope of the privilege recognized in those two decisions. After holding hearings and considering a number of bills on the subject, the Legislature enacted Civil Code section 43.8, specifically providing: "*In addition to the privilege afforded by Section 47,* there shall be no monetary liability on the part of . . . any person on account of the communication of information . . . to any hospital, hospital medical staff, professional society, medical or dental school, or professional licensing board when such communication is intended to aid in the evaluation of the qualifications, fitness or character of a practitioner of the healing arts and does not represent as true any matter not reasonably believed to be true." (Italics added.) (Stats. 1974, ch. 1086, § 1, p. 2313.)

The legislative history of the 1974 statute demonstrates that the legislative draftsmen were well aware of both the *Ascherman* and *Goodley* decisions, and that the introductory clause of the provision, specifying that the new privilege provided by section 43.8 was "in addition" to the privilege accorded by section 47, was inserted to assure that the new statute was not interpreted to remove any of the protection afforded by those authorities at both governmental and nongovernmental proceedings.[3] Moreover, if any ambiguity as to the legislative intent in this area

47, subdivision 2 it would appear that witnesses who testify at such proceedings would not enjoy the protection of an absolute privilege simply because the proceeding is not conducted by a governmental body or a public official.

[3]As originally introduced, the legislation did not include the introductory clause. At the request of the Assembly Judiciary Committee, to whom the bill was assigned, ·the

remained after the 1974 legislation, it most assuredly was removed when, in 1975, the Legislature added the final sentence to section 43.8 which specifically provides: "The immunities provided by this section and by Section 43.7 shall not affect the availability *of any absolute privilege* which may be afforded by Section 47." (Italics added.) (Stats. 1975, 2d Ex. Sess., ch. 1, § 24.4, p. 3968.)

Viewed against the background of the *Ascherman* and *Goodley* decisions, the 1974 and 1975 legislative measures clearly indicate a legislative intent to endorse the conclusion that section 47, subdivision 2 provides an absolute immunity from defamation for witnesses who testify at quasi-judicial medical review board proceedings, without regard to whether the medical board is governmental or nongovernmental in nature.[4]

Finally, not only is the majority's interpretation of subdivision 2 incompatible with the purpose of the provision, with past judicial authorities and with the most recent legislative expressions on the matter, but the effect of the majority decision is to create a distinction between governmental and nongovernmental medical review proceedings that is illogical and totally unwarranted. In *Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802 [140 Cal.Rptr. 442, 567 P.2d 1162], our court was faced with the somewhat analogous issue of whether the provisions of Code of Civil Procedure section 1094.5, which clearly applied to judicial review of quasi-judicial decisions of *governmental* medical bodies, should also be applied in judicial actions reviewing quasi-judicial decisions of *nongovernmental* medical authorities.

---

Legislative Counsel prepared an opinion which discussed in detail the current state of the law concerning the privileged status of communications to medical bodies, analyzing the *Natanson* and *Goodley* decisions at some length and informing the legislators that the decisions had accorded an absolute immunity against defamation actions to statements made in relation to quasi-judicial proceedings of "a state or local professional society or medical staff of a licensed hospital." (Ops.Cal.Legis. Counsel, No. 11581 (June 5, 1974) Libel (Assem. Bill No. 3633 and Assem. Bill No. 3760).) Relying on the legislative counsel opinion, the "bill digest" prepared for the legislators by the Assembly Judiciary Committee states that "The bill provides an absolute privilege in defamation actions." Subsequently, to ensure that the enactment of the new section would not be read as disapproving or overruling the *Natanson* and *Goodley* decisions, the introductory clause discussed in text was added to the bill.

[4]The majority's alternative explanation of the legislation—suggesting that the Legislature believed that section 47, subdivision 2 applied only to governmental proceedings and passed section 43.8 to extend protection to private entities—does not withstand analysis, both because of the Legislature's clear awareness of the *Goodley* decision and because the terms of section 43.8 itself make it clear that the Legislature did not intend to draw any distinctions between nongovernmental medical bodies ("professional society") and governmental medical bodies ("licensing board or division").

In *Anton* we concluded that section 1094.5 did govern judicial review of such "private" quasi-judicial proceedings, stating in the course of our analysis: "[W]e point out a compelling practical consideration which renders the use of section 1094.5 procedures particularly appropriate in cases of this kind. Section 32000 et seq. of the Health and Safety Code, the so-called Local District Hospital Law, makes specific provision for a hearing in matters of this nature which arise in the context of a *public* hospital operated by a hospital district . . . and the clear applicability of our decision in *Pinsker* v. *Pacific Coast Society of Orthodontists, supra,* 12 Cal.3d 541, insures that such a hearing will be accompanied by the related procedural protections requisite to section 1094.5 review. *It would be incongruous,* we believe, *to hold that the decisions of private hospital boards, which are required by the same decision to be based upon a hearing of substantially identical scope and purport, were to be subject to some different form of review.*" (19 Cal.3d at p. 818.) The majority's interpretation of section 47, subdivision 2, of course, adopts the very "incongruous" result our court specifically eschewed in *Anton.*

Although the majority point to no relevant distinctions between the proceedings of "public" and "private" medical review boards,[5] the

---

[5]Although in one brief footnote (*ante,* p. 60, fn. 3), the majority imply that a distinction between "public" and "private" proceedings may be warranted either because "there is no legal requirement that members of private bodies take any oath of office" or because "it [is not] required that witnesses . . . take a testimonial oath," for a number of reasons neither of these factors provides a basis for distinguishing governmental medical peer review proceedings from nongovernmental proceedings.

First, although some officials of a public hospital district may be required to take an oath of office, the majority point to no legal provision which requires the typical physician who serves on a public hospital peer review committee to be a "public officer" in any formal sense or to take any formal oath of office; in fact, such physicians perform in an identical capacity whether they are serving on medical review boards of public hospitals, private hospitals or local medical associations. (See, e.g., CMA-CHA Uniform Code of Hearing & Appeal Procedures, § 2, subd. (c), set forth in CMA, Guiding Principles for Physician-Hospital Relationships, p. 10 [hereafter CMA-CHA Uniform Code of Procedures]; CMA, Constitution and Bylaws (1976) ch. 3, § 1, subd. 2, pp. 11-12.)

Second, the governmental or nongovernmental status of the medical board does not determine whether witnesses at the board's quasi-judicial proceedings testify under oath. At both governmental and nongovernmental proceedings, testimony may be received under a legal oath administered by a duly authorized notary public or a similarly authorized individual. (See CMA-CHA Uniform Code of Procedure, *supra,* § 3, subd. (c), p. 12; Code Civ. Proc., § 2093; Gov. Code, § 8205.)

Finally, the existence of a testimonial oath—or, in like manner, the availability of subpoena power—is irrelevant to the application of section 47, subdivision 2 for a more basic reason. As all of the established authorities make clear, the absolute testimonial privilege enjoyed by witnesses applies whether or not a witness is testifying voluntarily, and whether or not the witness is under oath. (See, e.g., *Ascherman* v. *Natanson, supra,* 23 Cal.App.3d 861, 866. See generally Rest.2d Torts, § 588, com. (b); Prosser, Law of Torts (4th ed. 1971) pp. 777-778; 1 Harper & James, Law of Torts (1956) § 5.22, pp. 423-424.)

majority decree a sharp difference in legal treatment as to the witnesses who testify in such proceedings. Beginning with *Pinsker,* however, our court has taken pains to emphasize the similarities in both function and responsibilities of public and private bodies in this field (see, e.g., 12 Cal.3d at pp. 553-554; *Westlake, supra,* 17 Cal.3d at p. 484; *Anton, supra*) and, indeed, the very foundations of the requirement that professional associations conduct quasi-judicial proceedings in these matters derived, in large part, out of the "public service" status of such organizations. (*Pinsker, supra,* 12 Cal.3d at pp. 553-554.) The majority's approach in the instant case demonstrates a disturbing lack of sensitivity to these doctrinal considerations.

A decade ago, the New York Court of Appeals was faced with the question of whether statements critical of an attorney that were made in the course of a local bar association grievance proceeding were or were not protected by an absolute privilege. In concluding that the statements enjoyed an absolute privilege, Chief Judge Fuld explained on behalf of a unanimous court: "Assuredly, it is in the public interest to encourage those who have knowledge of dishonest or unethical conduct on the part of lawyers to impart that knowledge to a Grievance Committee or some other body designated for investigation. If a complainant were to be subject to a libel action by the accused attorney, the effect in many instances might well be to deter the filing of legitimate charges. We may assume that on occasion false and malicious complaints will be made. But, whatever the hardship on a particular attorney, the necessity of maintaining the high standards of our bar . . . requires that there be a forum in which clients or other persons . . . may state their complaints . . . ." (*Wiener* v. *Weintraub, supra,* 292 N.Y.S.2d 667, 669.) In my view, these sentiments have equal application to testimony given at a quasi-judicial hearing of a local medical society.

I would affirm the trial court judgment dismissing plaintiff's defamation action.

Clark, J., and Richardson, J., concurred.

Respondents' petitions for a rehearing were denied May 16, 1979. Tobriner, J., Clark, J., and Richardson, J., were of the opinion that the petitions should be granted.